JDG:CMP/AMC
F.#2011R01474

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

**12 M 530**

- - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- against -

MICHAEL PROVENZANO,

                      Defendant.

- - - - - - - - - - - - - - - - X

To Be Filed Under Seal

COMPLAINT AND AFFIDAVIT
IN SUPPORT OF APPLICATION
FOR ARREST WARRANT

(18 U.S.C § 666(a)(1)(B))

EASTERN DISTRICT OF NEW YORK, SS:

       NAUSHAUN RICHARDS, being duly sworn, deposes and states that he is a Special Agent of the Federal Bureau of Investigation duly appointed according to law and acting as such.

       Upon information and belief, in or about and between January 2004 and December 2009, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant MICHAEL PROVENZANO, together with others, being an agent of a local government agency, to wit: the New York City Department of Housing Preservation and Development ("HPD"), which agency received in excess of $10,000 under one or more Federal programs involving grants, contracts, subsidies, loans, guarantees, insurance and other forms of Federal assistance in one or more one-year periods, did knowingly, intentionally and corruptly solicit and demand for the benefit of PROVENZANO, and accept and agree to accept, one or more things of value, to wit:

cash payments, from another person, to wit: a general contractor with significant business with HPD, intending to be influenced and rewarded in connection with business and one or more transactions and series of transactions of HPD involving things of value of $5,000 or more.

(Title 18, United States Code, Sections 666(a)(1)(B), 2 and 3551 et seq.)

The source of your deponent's information and the grounds for his belief are as follows:[1]

1. I am a Special Agent of the FBI, duly appointed according to law and acting as such. I have been an FBI Special Agent for approximately 13 years and am currently assigned to Squad C-24, a joint task force comprising FBI agents and New York City Police Department officers charged primarily with the investigation of Eurasian and Eastern European organized crime in the New York metropolitan area. Such investigations also often involve white collar and public corruption offenses. In the course of those investigations, I have conducted or participated in physical and electronic surveillance, deployment of undercover agents and confidential informants, execution of search warrants

---

[1] Because the purpose of this Complaint is to set forth only those facts necessary to establish probable cause to arrest, I have not described all of the relevant facts and circumstances of which I am aware. In addition, when I rely on statements made by others, such statements are set forth in part and in substance unless otherwise indicated.

and analysis of telephone and financial records. I have also debriefed numerous cooperating witnesses and confidential sources, including those described below. I have personally participated in this investigation by, among other things, conducting surveillance, directing the activities of cooperating witnesses, interviewing other witnesses, executing search warrants, and reviewing financial and property records, among other investigative techniques. I am also familiar with the facts and circumstances of this investigation from information provided to me by other agents and investigators.

### The Department of Housing Preservation and Development

2. During the relevant time period, HPD was a municipal public agency created under Chapter 42 of the New York City Charter and regulated under Title 28 of the Rules of the City of New York (the "NYC Rules") to provide affordable housing to the residents of New York City.

3. As the largest municipal provider of affordable housing in the country, HPD's purpose was to provide affordable housing in various forms to the residents of New York City. HPD ran a number of programs that were intended to develop affordable housing, including, among others: (1) the Neighborhood Entrepreneurs Program ("NEP"), which was intended to enable neighborhood-based private property managers to manage and own clusters of occupied and vacant New York City-owned buildings as

affordable housing; (2) the Neighborhood Redevelopment Program ("NRP"), whereby HPD conveyed clusters of occupied and vacant New York City-owned buildings to designated not-for-profit organizations for rehabilitation and operation as affordable rental housing; and (3) New Construction, which managed various programs that offered vacant and underutilized New York City property holdings for residential and mixed-use development.

4. During the relevant time period, HPD was a local government agency that received millions of dollars under Federal programs involving grants, contracts, subsidies, loans, guarantees, insurance and other forms of Federal assistance. HPD received in excess of $10,000 of such funds in one or more one-year periods.

5. Pursuant to Title 28 of the NYC Rules, HPD was charged with selecting real estate developers, or "sponsors," to develop NEP and NRP projects. The NYC Rules provided that "HPD may select a Sponsor for a Project by any method which HPD determines will best further the purposes of the Program, including, without limitation, pursuant to a request for qualifications process, pursuant to a request for proposals process, selection from a pre-qualified list or, in the discretion of HPD, by a direct designation of an entity judged by HPD to be suitable for the task."

4

6. After HPD selected a developer for a particular project, HPD and the developer selected a general contractor responsible for the construction, rehabilitation and renovation of the properties involved in that project.

7. HPD operated throughout New York City, including within the Eastern District of New York.

### The Defendant

8. From in or about 1990 to the present, the defendant MICHAEL PROVENZANO has been employed by HPD in various capacities. From in or about and between January 2004 to December 2009, PROVENZANO was the Director of Construction Services for the Loan and Construction Management Programs within HPD's Department of Architecture and Construction Engineering ("DACE").[2] As part of his responsibilities, PROVENZANO supervised others who conducted inspections of HPD construction projects, including construction projects under various HPD programs, such as NEP, NRP and New Construction. The DACE inspectors visited HPD-related construction sites and conducted inspections of the sites for various matters, including identifying the number of workers observed at the sites. The

---

[2] During the relevant time period, DACE was reorganized within HPD so that its duties and responsibilities were carried out under the Division of Construction Services and Division of Architecture and Engineering ("DCS-DAE"). PROVENZANO's title remained the same and his responsibilities remained largely the same following the reorganization.

DACE inspection reports were used by HPD to determine whether a real estate developer or contractor was complying with federal, state and contractual wage requirements.

The Defendant's Acceptance of Bribes from a General Contractor

9. The cooperating witness ("CW") was a general contractor and real estate developer who had been awarded extensive general contracting work with HPD.[3]

10. The CW was under a contractual obligation with HPD to pay the employees, including carpenters and laborers, working on the CW's HPD construction projects federally-required prevailing wages. With the CW's knowledge, however, a subcontractor for the CW (the "Subcontractor") routinely paid workers less than the required prevailing wages on HPD-related construction projects. The CW then knowingly submitted to HPD inflated requisitions for payment that included the false

---

[3] In 2011, the CW pleaded guilty, pursuant to a cooperation agreement, to racketeering conspiracy in violation of 18 U.S.C. § 1962(d), involving predicate acts of bribery in connection with the CW's bribery of a high-ranking HPD employee, and wire fraud and money laundering conspiracy in connection with kickbacks that the CW paid to real estate developers; as well as substantive counts of bribery, wire fraud conspiracy and money laundering conspiracy regarding the CW's kickbacks and bribery, in addition to substantive counts of wire fraud conspiracy and false statements based on the CW's failure to comply with prevailing wage regulations and related over-reporting of wages to HPD in inflated requisitions for payment. In exchange for his cooperation, the CW is hoping to receive leniency at sentencing. The CW's information has been corroborated by, among other things, bank records, contracts, property records and other documents; consensual recordings; and information from other cooperating witnesses and confidential sources.

representation that carpenters, laborers and other workers on the relevant HPD projects were being paid the federally-required prevailing wages, when in fact, such workers were being paid substantially less. The Subcontractor often used the difference between the prevailing wage and the actual wage paid to the workers to pay undocumented immigrant laborers who were hired to work on the job sites. Thus, the certified payroll forms submitted with the requisitions for payment generally under-counted the number of workers employed at the sites by the CW and the Subcontractor. As a result, these false requisitions caused HPD to make overpayments to the CW.

11. The CW has advised that in or about 2004, MICHAEL PROVENZANO invited the CW to meet at a café located in the vicinity of PROVENZANO's residence in Valley Stream, New York. At the meeting, PROVENZANO offered to give the CW information about upcoming real estate development projects being put up for bid by HPD. The CW gave PROVENZANO a bottle of liquor at this meeting.

12. In or about and between 2004 to 2009, the CW and PROVENZANO had annual meetings at various locations, including Bellmore, New York and West Hempstead, New York. At each meeting, the CW would pay PROVENZANO $10,000 in cash. In exchange for these yearly $10,000 payments, PROVENZANO would provide the CW with, among other things, copies of DACE

inspection reports for the CW's HPD projects. These inspection reports included information reporting the number of workers that DACE inspectors had observed at each job site. Armed with this information, the CW was able to conform the certified payrolls and requisitions for payment that the CW submitted to HPD with the inspection reports in order to avoid being penalized by HPD for, among other things, fraudulently reporting the number of workers and/or not paying federally-required prevailing wages to all workers at the CW's job sites.

13. Because public filing of this document could result in a risk of flight by the defendant, as well as jeopardize the government's investigation, your deponent respectfully requests that this complaint, as well as any arrest warrant issued in connection with this complaint, be filed under seal.

WHEREFORE, your deponent respectfully requests that a warrant issue for the arrest of the defendant MICHAEL PROVENZANO that he may be dealt with according to law.

_____
NAUSHAUN RICHARDS
Special Agent
Federal Bureau of Investigation

Sworn to before me this
4th day of June, 2012
_____

⁃K
JDGE
⁃K

9